**United States District Court**
For the Northern District of California

1

2

3

4

5          IN THE UNITED STATES DISTRICT COURT

6          FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8   FRANCISCO ORTIZ,                              No. C 08-04834 SI

9              Petitioner,                        **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

10       v.

11  D.G. ADAMS,

12             Respondent.
                                        /
13

14                            **BACKGROUND**

15       On November 10, 2005, a jury found petitioner Francisco Ortiz guilty of second degree murder

16  and arson.  Petitioner was sentenced to a term of 23 years to life.  On October 4, 2007, the California

17  Court of Appeal affirmed the judgment of the trial court.  On November 6, 2007, petitioner filed a

18  petition for review in the California Supreme Court, which was denied on January 16, 2008.  On

19  October 22, 2008, petitioner filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254.

20  Petitioner contends that he is entitled to the writ for three reasons: (1) violation of his Sixth Amendment

21  right to counsel under *Massiah v. United States*, 377 U.S. 201 (1964); (2) violation of his Fifth

22  Amendment right as a criminal defendant to discover material exculpatory evidence under *Brady v.*

23  *United States*, 373 U.S. 83 (1963); and (3) violation of his due process rights through the introduction

24  of improper testimony.

25       The California Court of Appeal summarized the facts of the case as follows:

26       **A.     Smith's Death**

27

28

**United States District Court**
For the Northern District of California

On the morning of Tuesday, February 24, 2004,[1] 25-year-old Felicia Smith was killed at her Bay Street home in San Francisco.  As her body lay on her bed, the bed was set on fire.  Smoke was first seen coming from the chimney of the house between 7:00 and 7:30 a.m. that morning.  Firefighters were summoned between 8:30 and 8:40 a.m.  When they arrived at the house, they could see smoke coming out of the ground level of the house.   The fire had smoldered, producing smoke for several hours after it began.  It was contained on the bed in Smith's ground floor apartment where firefighters found her charred body.  The area around the mattress did not sustain significant burn damage.  The fire was quickly extinguished and arson investigators were contacted.

Nothing appeared to be missing from the house, but smoke detectors had been disconnected or removed.[2]  The position of the body on the bed was unusual—arms and legs askew, with the feet at the head of the bed atop the remains of a pillow.  An uncapped Jim Beam bottle—partly full of liquid, wrapped in a blanket—was found upright under the bed.[3]  The pillow and the bottle were at opposite ends of the bed—another physical arrangement that seemed odd.  Arson experts opined that the fire had been intentionally set on the mattress, probably with an open flame.

### B.    Investigation

About 9:00 a.m., San Francisco police learned that a charred body had been found at the Bay Street address, but Smith's identity had not then been determined.  The name and telephone number of an incoming caller was recorded along with a message left on an answering machine there about 3:10 a.m.  The caller implored Smith to let him back into the house, to talk with him.  Arson investigators brought the tape-recorded message to the attention of police.

Between 11:00 a.m. and noon, San Francisco Police Inspector Dennis Maffei called the telephone number and spoke with appellant Francisco Ortiz, who agreed to meet with police.  Over the next few days, Maffei interviewed Ortiz several times.  The first interview took place about 12:30 p.m. on February 24 at a restaurant where Ortiz worked as a cook.  Maffei audiotaped that interview.  At this point, Ortiz was not a suspect—the police were merely gathering information about a suspicious death.

Maffei told Ortiz that Smith had been found dead—news that elicited an emotional response from Ortiz.  He told Maffei that Smith had been his girlfriend since the previous summer.[4]  He also talked about being with Smith at her parents' Bay Street home on Monday, February 23.  Her parents were out of the country and he was staying with Smith while they were away.  Ortiz cooked dinner.  Both of them consumed alcohol with dinner.

Ortiz told Maffei that Smith was taking antidepressants and smoking marijuana that night, too.  He reported that Smith got angry and violent when she drank alcohol and she took various medications.  Ortiz also mentioned a problem that she had with a boyfriend named James who had tried to strangle her and against whom Smith said that she had obtained a restraining order.

---

[1] All calendar dates refer to the 2004 calendar year unless otherwise indicated.

[2] Ortiz's fingerprints were not found on the smoke detectors.  Later, Smith's parents discovered that a photograph of Ortiz and a camera were missing from their upstairs dining room.

[3] No fingerprints were found on the bottle.

[4] Smith and Ortiz had known each other years earlier, when she was much younger.  They had broken up briefly in December 2003, but reunited in January 2004.

**United States District Court**
For the Northern District of California

1

2

3

4

5

Ortiz said that after dinner, he and Smith had sexual intercourse. Later on in the evening of February 23, he and Smith went out to a bar in San Francisco, where they played several games of pool and had more beer. After they returned home, Smith pushed him out of her house. By this time, Ortiz told police, it was about 1:00 a.m. on Tuesday, February 24. Within 10 minutes, he went back to the house and knocked on Smith's window. Smith was still angry with him—she poured beer on him and told him to go away. Ortiz then walked to his Hyde Street apartment. He told police that he arrived at his apartment—where he said that he lived alone—about 2:00 a.m. He slept until about 7:00 a.m. He called Smith by 7:30 a.m., leaving a message for her but she did not call him back. He went to work about 11:00 a.m. that morning.

6

7

8

Ortiz did not have any prior criminal record, so there was no identifying information about him in criminal justice records. After the initial interview, he agreed to allow police to take his fingerprints and photograph. Maffei gave Ortiz several numbers where he could be reached. Later, Ortiz's fingerprints were compared with city, state and federal criminal justice databases, without any match.

9

10

11

12

Ortiz's wife Emilia Canet[5] later testified that on February 24, Ortiz came into their Hyde Street apartment about 7:15 a.m., looking tired and upset, smelling of alcohol.[6] She sensed that something was wrong—she suspected that Ortiz had lost his job. He had been drinking a lot in recent weeks and she was concerned about him. Ortiz brought a backpack home with him and took out the garbage that morning. That evening, Maffei came to the apartment, where he tape-recorded an interview with Canet. They searched Ortiz's clothing, found the backpack with his clothes in it, and retrieved a disposable camera from the garbage.

13

14

15

16

On February 25, the medical examiner identified the remains from the Bay Street fire as the body of Felicia Smith. The medical examiner concluded that Smith had died before the fire was started. By this time, arson investigators had also concluded that the fire had been deliberately set. These facts and the inconsistencies between Ortiz's statement and the information they learned from Canet caused police to focus on him as a suspect. They decided to interview him again.

17

18

When Maffei got to work on the morning of February 26, a telephone message was waiting for him from Ortiz. He was upset and crying during the call. Ortiz told Maffei that he felt guilty for leaving Smith alone. He wanted to talk with Maffei about "the accident."

19

20

21

22

Ortiz was brought in for questioning by Maffei again that evening. This interview was videotaped. By this time, Maffei regarded Ortiz as a suspect and Ortiz was given his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436) before the interrogation began. In this interview, the police learned new details about the night before Smith died. According to Ortiz, about midnight, when they were finished playing pool, Smith wanted to go to a second bar, but Ortiz was too tired. Smith asked Ortiz for some more marijuana, but he refused. As they walked back to the Bay Street house together, he knew that Smith was angry with him. She appeared to be intoxicated—her balance was off and her speech was slurred.

23

24

25

26

27

[5] Canet and Ortiz had been married for almost 12 years and had an 11-year-old son. Soon after their son was born, the couple ceased having sexual relations. Ortiz's drinking and infidelity were issues in the marriage. Ortiz often left for a few days at a time and did not spend the night at the apartment on a regular basis. Canet treated it as if they were separated. She did not know Smith. In November 2003, she saw Smith's name on Ortiz's cell phone - he told her that he had met Smith at work and had had a brief affair that was already ended. They did not speak of Smith after that until two days after Smith's death, when Ortiz told Canet that he and Smith had argued.

28

[6] Maffei later testified that he recalled Canet saying that Ortiz appeared to have been crying.

United States District Court
For the Northern District of California

1
2
3

Back at the house, Smith smoked marijuana and drank beer while Ortiz watched television. They argued because she wanted him to get her more marijuana. Smith pushed Ortiz several times in an aggressive manner. He got his clothes and left. Smith told him she did not want him at the house anymore.

4
5
6

Ortiz admitted that he did not live in the Hyde Street apartment alone, as he had earlier told police. He told police that he had slept in the basement on the night that Smith died so he would not disturb his wife, who found the smell of alcohol upsetting. Ortiz said that he did not sleep at all that night, worrying about Smith. He told police that he called Smith's cell phone at 7:15 or 7:30 a.m. from his cell phone.

7
8
9

Ortiz told Maffei that he felt guilty about Smith's death—he believed that if he had stayed with her, he could have prevented it. The police told Ortiz that arson investigators believed that Smith's bed was deliberately set on fire. They had ruled out the possibility that the fire had started because Smith fell asleep with a burning cigarette in her hand. The medical examiner and arson investigators believed that Smith was dead before the fire started.

10
11
12

The police questioned Ortiz about a message he left on Smith's answering machine at the Bay Street house—a message that was sent at 3:10 a.m. on the morning of February 24. During the interview, the police suggested that Ortiz was not on Hyde Street when he made that call, but was still near the Bay Street house.[7] Eventually, Ortiz admitted that he was still in front of Smith's house about 3:00 a.m. This contradicted his earlier statement that he had left Smith's house almost two hours earlier.

13
14
15

Inspector Maffei tried to obtain a confession from Ortiz, even going so far as to lie to him about some of the evidence that he said that he had. He accused Ortiz of lying. Ortiz repeatedly denied killing Smith or setting the fire. He contacted the public defender's office, which advised the police that Ortiz would not consent to any further interviews.

### C.  Arrest and Preliminary Proceedings

16
17
18

On October 18, Ortiz was arrested and charged with first degree murder and arson of an inhabited structure. (See §§ 187, 451, subd. (b).) Bail was set at $1 million. On October 20, a San Francisco newspaper reported that Ortiz had been arrested for killing his girlfriend after a quarrel.

19
20
21

On November 17, San Francisco Police Inspector Tom Cleary told Maffei that a jail inmate named Richard French said that he had information about the Felicia Smith case. French had helped Inspector Cleary on another case. Maffei verified that French and Ortiz were housed in the same part of the county jail. Then, on November 17, Maffei had French brought in for an interview.[8]

22
23
24
25

Maffei had never met French before. French related statements that Ortiz made to him, confessing to having killed Smith. He said that Ortiz told him that he had killed his girlfriend because she threatened to tell Ortiz's wife that she was pregnant, even though she was not. French indicated that he was willing to testify in the Ortiz case. He asked for no consideration. Maffei did not pay French any money or make French any promises, nor did he attempt to influence the prosecutor on French's case.

26
27

[7] Maffei had gotten a search warrant for Ortiz's cell phone records, but he had not actually obtained these records by the time of the February 26 interview.

28

[8] This interview was videotaped, but the tape was not audible.

4

**United States District Court**
For the Northern District of California

After their initial meeting, Maffei returned French to jail and the sheriff returned French to his cell near Ortiz.  He did not make any arrangements to place French and Ortiz in the same cell. Maffei did not tell him not to talk to Ortiz, nor did he pose any specific question for French to ask. Maffei did not furnish his case file, photographs or tapes about the Ortiz case to French. French and Ortiz continued to talk in jail, although Ortiz did not say anything as specific as he had said before.  Still, French called Maffei and left voicemail messages for him whenever Ortiz said anything that seemed important about his case.

French met with Maffei again on November 18, the day after their initial meeting.[9]  This time, he told Maffei that Ortiz's motive for killing his girlfriend was because she was breaking up with him.   At a third interview on November 22, French mimicked a hand gesture—circling something with his hands—that he told Maffei that Ortiz had displayed when telling French that he felt his anger "go up" as Smith died.[10]  French had not gestured in this manner at the two earlier meetings.

Shortly after this third meeting with Maffei, French was moved to a different part of the jail from that in which Ortiz was housed.  He asked Maffei to arrange for him to be transferred back to Ortiz's cell, but Maffei refused.  French did not call Maffei again about the Ortiz case, but he met with Maffei to pass along information about another case.   Shortly before Ortiz's preliminary hearing, Maffei told French that he would have to testify at that hearing.  He later told the trial court that Maffei did not give him the impression that he would be released after the preliminary hearing.

French testified in April 2005 at Ortiz's preliminary hearing, recounting the incriminating statements that he said that Ortiz told him.  On the basis of this and other evidence, a magistrate found that there was sufficient cause to believe that Ortiz was guilty of murder and arson of an inhabited structure to justify binding him over for trial.

### D.      Pretrial Matters

In May 2005, Ortiz was charged by information with Smith's murder and arson of an inhabited structure.  (See §§ 187, 451, subd. (b).)  He pled not guilty to both charges.  During discovery, Ortiz sought further information about French, who was alleged to have heard confessions from as many as six persons with whom he had been incarcerated.  He submitted questions to ask of each officer to whom French recounted the various confessions.  He also sought French's psychiatric records.   In August 2005, French's October 2003 burglary case was still pending—his trial was not expected to begin until after he testified at Ortiz's trial.

In September 2005, the prosecution moved for a foundational hearing to exclude and limit some defense evidence.[11]  (See Evid. Code, § 402.)  Ortiz filed his own pretrial motion to exclude certain prosecution evidence as more prejudicial than probative.  He also sought inter alia a foundational hearing about the admissibility of his confession and an order compelling prosecutorial disclosure of all evidence favorable to him.  (See Evid. Code, §§ 350, 352, 402;

---

[9] This interview was not taped.

[10] This interview was not taped.

[11] The motion originally sought a ruling on the admissibility of any third party culpability for the murder or arson.  Ortiz opposed the motion.  By the time the motion in limine was argued, the prosecutor had withdrawn it.

**United States District Court**
For the Northern District of California

1
2

see also CALJIC No. 3.20.)  By this time, French—who had been released from jail in May 2005—was jailed again in San Mateo County.  He was returned to San Francisco from San Mateo County for a hearing on the motions in limine.

3
4
5
6
7
8

The trial court held a hearing on these in limine motions.  (See Evid. Code, § 402, subd. (b).) French had a long criminal history.  He explained how he came to be jailed with Ortiz.  He had been arrested in October 2003 for first degree burglary and had been placed in San Francisco jail.  He was on parole at the time and a parole hold had also been placed on him.  By the following June, he had completed his term for his parole violation and his bail had been reduced to $10,000.  He was released on bail, but when he failed to appear at a court hearing, a bench warrant issued for his arrest.  He was arrested on that warrant on November 5.  At the time of the arrest, French was driving a stolen vehicle and was being held for another parole violation.[12] Resolution of the October 2003 residential burglary charge was still unresolved at that time, more than a year later.

9
10
11

French was assigned to one part of the jail, but he asked to be moved to another part where he had been more comfortable before.  On November 12, he was moved to the part of the jail where he met Ortiz.  French told police that Ortiz learned that French had a prior murder conviction. He asked French about the difference between homicide law at the time that French had been convicted and the law in effect at that time.  In one of their conversations, Ortiz made comments that prompted French to call Inspector Cleary.

12
13
14
15
16

French told the trial court what Ortiz had said to him in jail—that his case was like that of Scott Peterson, except that his girlfriend was not pregnant; that women needed to understand their place; that his girlfriend had threatened to tell his wife that she was pregnant, even though she was not; and that he feared losing his relationship with his wife and son if his girlfriend did so. French also recounted that Ortiz told him that he did not mean for it to happen, but that matters became "heated."  Ortiz told French that when his girlfriend passed, all the anger and energy left him.  As Ortiz said this, he made a hand gesture that mimicked strangulation.  He also told French that he was not worried about DNA evidence because he was certain that there would be DNA present that was not his.

17
18
19
20
21

French also testified that no one in the police department asked him to speak to Ortiz; no one made a specific offer of consideration, although he hoped for consideration at sentencing; and the Ortiz prosecutor had only told him to tell the truth.  The trial court denied Ortiz's motion to exclude this statement on grounds pursuant to *Massiah v. United States* (1964) 377 U.S. 201 (*Massiah*), concluding that French did not act as a government agent when he obtained this statement from Ortiz.  Later, Ortiz objected that French's statement that Ortiz had compared his case to that of Scott Peterson was evidence that should be excluded as more prejudicial than probative. (See Evid. Code, § 352.)  The trial court also overruled that objection to this proffered evidence.

22
23

### E.    Trial

24

#### 1.       Ortiz's Statements and Physical Evidence

25
26
27

At trial, the jury heard and saw audio and videotape recordings of Ortiz's interviews with Maffei and the telephone messages that he left for Smith and Maffei.  It also viewed a videotape of the crime scene taken after the fire was put out but before the medical examiner removed Smith's body.  An expert fire scene analyst opined that the fire was intentionally set and that it

28

[12] No new charges were filed with regard to the stolen vehicle, although this incident formed the basis of the allegation that French violated parole.

**United States District Court**
For the Northern District of California

smoldered for at least an hour before it was first observed about 7:20 a.m.  The fire may have begun five hours before it was extinguished about 8:45 a.m.—perhaps as early as 3:45 a.m.

Smith's body was so badly burned that the medical examiner was unable to determine an official cause of death or to set the time of death.[13]  As Smith was dead before the fire began, death by strangulation was a logical, reasonable explanation for her death.  She had a blood-alcohol level of 0.13.  Her body was not tested for marijuana, but she had no other prescription or illegal drugs in her system.

Smith's vagina and anus contained semen.  That found in her vagina was consistent with Ortiz's DNA.  The semen could not have come from several other men with whom Smith was linked.

The prosecution also offered evidence that Smith had become pregnant with Ortiz's child and that Smith had an abortion in late January 2004.  Ortiz had seemed angry about her decision to have the abortion.  Their stormy relationship had been punctuated by loud arguments but no physical violence.  On Monday nights, Smith and Ortiz would often drink and sometimes quarrel.   Shortly before she died, Smith told her ex-husband that she feared that an ex-boyfriend—someone other than Ortiz—was stalking her.  During the investigation into her death, several men connected to Smith were interviewed and DNA samples were taken from them.  DNA belonging to an unidentified human male[14] was found under Smith's fingernails at the time of her death.

### 2.    Cell Phone Records

On the night that Smith died, cell phone records showed that calls were made from Ortiz's cell phone to Smith's Bay Street home at 3:11 and 3:13 a.m.  The 3:11 a.m. call was relayed from a cell tower—or cell site—located atop the roof at 2620 Jones Street in San Francisco.[15]  Calls were also made from Ortiz's cell phone to Smith's cell phone at 3:13 and 3:27 a.m.  The first of Ortiz's calls to Smith's cell phone was relayed from a cell site at 2000 Van Ness Avenue,[16] while the second was relayed by the cell site on Jones Street.

After 3:27 a.m., no more calls were made from Ortiz's cell phone until 7:12 a.m., when calls were placed first to the Bay Street home and then to Smith's cell phone.  Both of these calls were

---

[13] One key fact tending to establish the range of time within which Smith was killed did come before the jury, which learned that Smith left a message on a friend's answering machine at 1:36 a.m. on the morning of February 24.

[14] On February 26, Ortiz gave a DNA sample and he was later excluded as a possible contributor of this DNA evidence.

[15] The Jones Street cell site was near the intersection of Jones and Bay Streets.  The fire occurred at Smith's Bay Street home between Polk and Larkin Streets.  We take judicial notice of a San Francisco map showing that this site was within a few blocks of Smith's Bay Street home.  (See Evid. Code, §§ 452, subd. (h), 459, subd. (a).)

[16] The Van Ness Avenue cell cite was located near Jackson Street and Van Ness Avenue.  Ortiz lived on Hyde between Geary and O'Farrell Streets.  We take judicial notice of a San Francisco map showing that this site was about halfway between the Bay Street house and Ortiz's Hyde Street apartment.  (See Evid. Code, §§ 452, subd. (h), 459, subd. (a).)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

relayed by a cell site at 965 Sutter Street in San Francisco.[17]  A city the size of San Francisco has many cell sites.  A cell phone call is usually relayed through a cell site that is closest to the calling cell phone.  If the cell phone's line of sight to the nearest cell site is obstructed, the call will be relayed through another cell site that is not obstructed.  Based on this evidence, Maffei opined that Ortiz's 3:00 a.m. calls to Smith came from the area near the Smith home on Bay Street, while his 7:00 a.m. calls to her originated in the Hyde Street area near Ortiz's apartment.

### 3.       Evidence of Jailhouse Confession

Before Richard French testified, the jury was admonished to view his testimony with caution. He told the jury that he and Ortiz were in jail together. While in jail, Ortiz told him that he had killed his girlfriend, with whom he had quarreled.  She was angry that he would not leave his wife.  Ortiz feared that his wife might prevent him from visiting his son.  His girlfriend threatened to tell his wife that she was pregnant with his child, even though she was not.  He also likened his situation to the Laci Peterson case, saying "[M]y case is like that, except mine wasn't pregnant."  A verdict had been announced in the Peterson murder case shortly after the two men were housed together in the same part of the jail.

French told the jury that Ortiz knew that French had been convicted of murder.  Ortiz asked whether French felt or saw the person leave the body at the time of the murder. French did not understand what he meant.  Ortiz said that when his girlfriend died, he watched "it" leave the body—he felt the life go out of her—and he felt all his anger going with it.  As he said this, Ortiz used a gesture that mimicked strangulation.

French contacted Inspector Cleary with this information and Maffei spoke with him about it. At their first meeting, he told Maffei that Ortiz had likened his own case to the Peterson case. At a second meeting, French told Maffei that Ortiz's motive for killing his girlfriend was because she was breaking up with him.[18]  At their third meeting, French showed Maffei the hand gesture that Ortiz used.  By this time, French had been moved out of Ortiz's part of the jail.  He asked Maffei to arrange to have him moved back, but Maffei would not do so.

French admitted that he had testified for the prosecution before—in a drug case, in two child molestation cases, and in a murder case.  He had been providing information to the police for almost 30 years.  He had been convicted of so many offenses that he did not know how many there were.  He was 49 years old and had been in trouble since he was a teenager.  He had been addicted to methamphetamine and heroin for more than 30 years.  He stole to support his drug habit.  He had been convicted of first degree murder, auto theft, burglary, and drug possession offenses.  He had been sent to prison for various offenses and had been returned to prison for violations of parole.

More recently, French had been convicted of impersonating another person, of failing to appear in court, and of petty theft.  He had pled guilty to receiving stolen property and possession of false identification, but had not yet been sentenced for those offenses.  He might be sentenced to as much as two years in prison for those offenses.  His October 2003 burglary case was also unresolved at the time of Ortiz's trial.  He expected to serve a year in jail for that offense.

---

[17] The Sutter Street cell site was between Hyde and Leavenworth Streets.  We take judicial notice of a San Francisco map showing that this site was about halfway between the Bay Street house and Ortiz's Hyde Street apartment.  (See Evid. Code, §§ 452, subd. (h), 459, subd. (a).)

[18]   On cross-examination, Ortiz brought out evidence that French had cited three different motives for killing Smith - to keep her from telling his wife about their relationship, to prevent his wife from keeping him from seeing his son, and because Smith was breaking up with him - at the preliminary hearing, the pretrial evidentiary hearing, and at trial, respectively.

8

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

French also testified about his history of providing information to police.  At the time of his October 2003 arrest, French had contacted San Francisco Homicide Inspector Tom Cleary. French passed on a cellmate's confession and Cleary added $40 to his jail account.  In May 2004, French told Inspector Kervin Silas that another cellmate had confessed a murder to him. Inspector Silas spoke to French's parole officer on his behalf.  During this period of incarceration, French also told Inspector Walsh about a third cellmate who had confessed a homicide to him.

The jury learned that once, when he had been arrested, he offered to provide information about a woman who would be transporting methamphetamine if the arresting officer would agree not to send him to jail.  He had also offered authorities information about a plot to kill a police officer that he learned about while in a San Francisco jail cell.  Three other inmates asked him to hire a hit man to kill the officer.  They intended to give him money to hire the hit man. Police took him out of jail, placed a wire on him and sent him to the location where the plot was to be discussed.  French was not able to provide evidence of a plot.  This incident led to a charge of providing false information to the police and a finding that he had violated the terms of his probation.

In September 2005, French was returned to San Francisco County jail so he could testify at a pretrial hearing in the Ortiz case.  During the month between that hearing and his October 2005 trial testimony, French remained jailed in San Francisco.  In that month, he had already contacted Inspectors Maffei and Cleary about yet another cellmate who provided information on another murder.

French admitted that he sometimes had auditory and visual hallucinations as the result of a mental disorder.  He took psychotropic medication for this disorder.  If he did not get his medication, he would hear voices.  Sometimes, he had seizures.  Shortly before Ortiz's preliminary hearing, he told someone in the jail psychiatric services that he might be leaving jail later that week.  In fact, French testified at the preliminary hearing on April 27, 2005, and was released on his own recognizance on May 12, 2005.  Before he was released, French told Inspector Brian Danker that another inmate had confessed to committing a home invasion robbery.

French also admitted that he had been interviewed by a Bay Guardian reporter after he told Maffei what Ortiz had said to him.  In the article, he was quoted as having told the reporter that a police officer once left him alone with someone else's case file before French offered a jailhouse confession citing some of the details from that file.  He testified that Maffei had told him to tell the truth.  He had never offered French money or shown him information about the Ortiz case.  Maffei confirmed many points of French's testimony when he offered his own testimony about his dealings with French.

At the close of the People's case-in-chief, Ortiz moved for acquittal on the charge of first degree murder, contending that the prosecution presented insufficient evidence to support a conviction of first degree murder.  That motion was denied.  (See § 1118.1.)

### 4.      Defense Case

In his defense, Ortiz offered the testimony of various police witnesses tending to undermine French's credibility by offering detailed descriptions of his past criminal conduct and false acts. These law enforcement officials painted a picture of French as a longtime heroin addict who regularly committed property crimes in order to support his habit.  He was often found in a stolen vehicle, bearing false identification, and in possession of stolen property.  He regularly gave police a false name, making it difficult to determine whether warrants were pending against him, as there often were.  More than once after being detained for shoplifting, French faked a

9

**United States District Court**
For the Northern District of California

1
2

seizure in an apparent bid to gain sympathy from store officials. In another instance, French offered to provide police with information about an upcoming drug sale in exchange for his release or a lesser charge.

3
4
5
6
7
8
9

The jury heard extensive evidence about an incident in which French offered false information to police in order to escape from jail. San Francisco Police Sergeant Stephen Gudelj testified that in October 1996, he investigated a case after French reported that three of his fellow cellmates were conspiring to kill another San Francisco police officer. An undercover police officer posed as the potential hit man during a telephone call from one of the supposed conspirators that French appears to have arranged for police. Then, French was released from jail in order to obtain the funds that one of the supposed conspirators trusted him to obtain to pay the supposed killer. Gudelj obtained court approval for French's release and sent him alone to two different locations to collect the money while wearing a hidden transmitter and recording device during each visit. Eventually, one of the other alleged conspirators told police that there was no conspiracy to kill the officer—that the whole plan was French's idea to get the two of them out of jail. In all, the investigation turned up no evidence of any real plot to kill a police officer.

10
11
12
13

A motion to revoke French's felony probation was filed based on his report of the alleged plot to kill a police officer. The primary basis of the motion to revoke probation was French's alleged conspiracy to escape from county jail by concocting a phony plot. Gudelj testified against French at the hearing on the probation revocation motion, as did two of the alleged co-conspirators. The trial court revoked French's probation and he was sentenced to state prison for two years as a result of this incident.[19]

14
15
16
17
18
19
20

Ortiz also offered the testimony of several of Smith's other former companions. Her former boyfriend, James Wing, told the jury that the two were romantically involved from January 2002 through May 2003. He believed that Smith had been faithful to him during this time. He was a recovering alcoholic. During most of the time that he saw Smith, he did not drink, which created a conflict in their relationship. Increasingly, she was using marijuana and taking prescription drugs, prompting arguments. In May 2003, Wing was arrested on domestic violence charges after a verbal dispute with Smith escalated and she became physically violent toward him. He denied inflicting any violence against her, but the court placed a three-month restraining order against him. After the restraining order lapsed in August 2003, Smith called Wing once, but he was no longer interested in seeing her again. Wing also testified that Smith showered and washed her hair daily and got a manicure every two weeks. He denied having anything to do with her death. Jose Cornejo testified that he met Smith in 1997. When each of them were getting divorced in 2001, they became lovers. They met every few months until the fall of 2003 for an intimate encounter, but were not in a serious relationship.

21
22
23

Tanith Nichols was Smith's former husband. He told the jury that he and Smith were married in June 1999. Their relationship was sometimes fiery. Although they separated in 2001, they kept in contact. Once, before they separated, Smith scratched his arm with her nails during an argument. Four years later, the scars were still visible. Smith practiced good hygiene, taking regular showers and getting her nails manicured.

24
25
26

Nichols spoke with Smith by telephone on February 22, two days before she died. She seemed anxious and distracted. She told Nichols that an ex-boyfriend that she did not want to talk with had been calling her. She felt threatened, like someone was following her. Alexis Rabourne, Smith's therapist from May 2003 to February 2004, testified that in December 2003, Smith complained that she had been getting "weird" phone calls, including some from a caller

27
28

---

[19] French's conviction after revocation of probation was affirmed by the District in 1998. (*People v. French* (Aug. 20, 1998, A077615) [nonpub. opn.].)

breathing into the telephone.  Smith did not believe that the caller was James Wing. Rabourne saw Smith six times after that session, but Smith did not mention her concern again.

### F.        Verdict and Sentence

The jury acquitted Ortiz of first degree murder, but found him guilty of the lesser included offense of second degree murder.  He was also convicted of arson of an inhabited structure. (See §§ 187, 451, subd. (b).)  He was sentenced to a total term of 23 years to life in prison—an upper determinate term of eight years for arson and a consecutive, indeterminate term of 15 years to life for second degree murder.

## LEGAL STANDARD

A federal court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *Id.* § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  *Id.* at 409.  Habeas relief

11

1 is warranted only if the constitutional error at issue was not harmless, i.e., it had a "substantial and

2 injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619,

3 637 (1993).

4      The federal habeas court must review the "last reasoned decision" of the state courts. *Ylst v.*

5 *Nunnemaker*, 501 U.S. 797, 803-04 (1991).  In this case, the last reasoned state court opinion is the

6 October 4, 2007 decision of the California Court of Appeal.

7

8                                           **DISCUSSION**

9 **I.      Exhaustion**

10     Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either

11 the fact or length of their confinement must exhaust their state court remedies by presenting the highest

12 state court available with a fair opportunity to rule on the merits of each and every claim they seek to

13 raise in federal court.  *See* 28 U.S.C. § 2254(b), (c).  The parties do not dispute that petitioner has

14 exhausted his state court remedies for the claims asserted in the petition.

15

16 **II.     Sixth Amendment Claim – *Massiah***

17     Petitioner first contends that the trial court erred by admitting the statements he made to

18 jailhouse informant French because these statements were obtained in violation of his Sixth Amendment

19 right to counsel under *Massiah v. United States*, 377 U.S. 201 (1963).  The Supreme Court has held that

20 the right to counsel under *Massiah* "guarantees the accused, at least after the initiation of formal charges,

21 the right to rely on counsel as a 'medium' between him and the State." *Maine v. Moulton*, 474 U.S. 159,

22 176 (1985).  Although "the Sixth Amendment is not violated whenever – by luck or happenstance – the

23 State obtains incriminating statements from the accused after the right to counsel has attached," the state

24 may not knowingly exploit an opportunity to confront an accused in the absence of counsel or

25 intentionally create a situation "likely to induce [him] to make incriminating statements without the

26 assistance of counsel."  *Id.*; *United States v. Henry*, 447 U.S. 264, 274 (1980).

27     To prove a Sixth Amendment *Massiah* violation based on the government's use of an informant,

28 a petitioner must show that the informant was acting as a government agent and that he or she

**United States District Court**
For the Northern District of California

12

1   "deliberately elicited" incriminating statements from the petitioner. *Massiah*, 377 U.S. at 206; *Henry*,

2   447 U.S. at 269-70.  In *Henry*, the Supreme Court found a Sixth Amendment violation where a paid

3   government informant, Nichols, had engaged the accused, Henry, in conversations regarding the charged

4   bank robbery. 447 U.S. at 266, 270-71.  The Supreme Court found that although Nichols was instructed

5   not to initiate any conversations with Henry, the government's awareness that Nichols "had developed

6   a relationship of trust and confidence with Henry" and would therefore "be able to engage him in

7   conversations without arousing Henry's suspicion" was sufficient to find a violation.  *Id.* at 269, 271.

8   The Court emphasized that although Nichols had not affirmatively questioned Henry, he had

9   "stimulated" conversations in which he was able to "elicit[] the statements in myriad less direct ways."

10  *Id.* at 271 n.8, 273.

11         In *Kuhlmann v. Wilson*, 477 U.S. 436 (1986), the Supreme Court addressed a question left open

12  in *Henry*: whether a *Massiah* violation may occur "where an informant is placed in close proximity but

13  makes no effort to stimulate conversations about the crime charged." *Henry*, 447 U.S. at 271 n.9.  The

14  *Kuhlmann* Court answered this question in the negative, holding that an informant placed in the

15  accused's cell for the sole purpose of listening to find out the names of accused co-conspirators did not

16  "deliberately elicit" information within the meaning of *Massiah*. *Kuhlmann*, 477 U.S. at 460.  The Court

17  noted that because "the primary concern of the *Massiah* line of decisions is secret interrogation by

18  investigatory techniques that are the equivalent of direct police interrogation," a petitioner seeking to

19  make out a *Massiah* claim "must demonstrate that the police and their informant took some action,

20  beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Id.* at 459.

21         In rejecting petitioner's *Massiah* claim on direct appeal, the California Court of Appeal held that

22  there was no *Massiah* violation because French was not acting as a government agent at the time

23  petitioner made the incriminating statements, and as such could not have deliberately elicited

24  information at the government's behest.  The Court of Appeal emphasized the following facts:

25         Maffei did not pay French or make him any promises.  He did not try to influence the
       prosecutor on French's case.  Maffei did not ask French to talk with Ortiz either
26     generally or about a specific topic.  He did not furnish French with any Ortiz case file,
       photographs or tapes.  He did not place the two inmates together in the same jail cell.
27     When French was transferred away from Ortiz and he asked Maffei to arrange for him
       to be transferred back, the officer refused.
28

13

**United States District Court**
For the Northern District of California

1        The Court of Appeal's conclusion was not contrary to or an unreasonable application of clearly

2   established federal law.  According a presumption of correctness to the state court's factual findings,

3   *see* 28 U.S.C. § 2254(e)(1), there is no direct evidence of any preexisting arrangement between French

4   and Inspector Maffei on the record in this case.  Notwithstanding French's prior contacts with police,

5   French initially approached the police working on this case on his own volition in order to offer

6   information that he had elicited from petitioner.  Inspector Maffei stated that French reported

7   petitioner's confession during this first meeting.  Maffei had not met French before this point.  These

8   facts place this case squarely outside the bounds of *Massiah*.  *See Kuhlmann*, 477 U.S. at 459 ("[A]

9   defendant does not make out a violation of [the right to counsel] simply by showing that an informant,

10  either through prior arrangement or voluntarily, reported his incriminating statements to the police.").

11       After French's initial meeting with Maffei, he was sent back to the same dormitory where

12  petitioner was being held.  According to the Court of Appeal, Maffei did not instruct French whether

13  to talk to petitioner or attempt to engage him in conversation.  Nonetheless, French met with Maffei

14  twice more and left him several voicemail messages to report statements petitioner had made, including

15  the statement during which petitioner made a hand gesture mimicking strangulation.  Even if there were

16  any *Massiah* error in French's subsequent contacts with petitioner, the Court must conclude that the

17  error was harmless.  Petitioner makes much of French's testimony regarding the strangulation gesture.

18  However, French's testimony as to the cause of death was not corroborated by any medical evidence

19  at trial.  The jury was admonished by the trial court and urged by the prosecutor to view French's

20  testimony with caution, particularly any uncorroborated testimony, and it must be presumed that the jury

21  heeded this instruction.  *See CSX Transp., Inc. v. Hensley*, 129 S. Ct. 2139, 2141 (2009).  Thus, even

22  if petitioner's statement and the accompanying strangulation gesture were obtained in violation of

23  *Massiah*, the evidence cannot have had a "substantial and injurious effect or influence in determining

24  the jury's verdict."  *Brecht*, 507 U.S. at 637.

25       Additionally, even if there were any error in the admission of French's testimony regarding

26  petitioner's confession, the Court concludes that this error was harmless as well.  First, the prosecution

27  introduced other compelling circumstantial evidence of petitioner's guilt.  The jury learned that

28  petitioner was staying with Smith in the weeks leading up to her death, that he often drank heavily, and

14

**United States District Court**
For the Northern District of California

1  that he and Smith often argued.  Petitioner himself testified that he and Smith argued the night before

2  her murder and she kicked him out of house.  He gave police inconsistent information regarding his

3  actions on the night of the murder, initially stating that he left Smith's house around 1 a.m. and returned

4  to his own home around 2 a.m., and later admitting that he attempted to go back to Smith's house around

5  3 a.m.[20] Petitioner stated that he "didn't need a key" in order to get into Smith's home.  Petitioner's wife

6  testified that he did not return to his own home until after 7 a.m., looking tired and upset and smelling

7  of alcohol.  Petitioner was wearing Smith's backpack, which contained a disposable camera with

8  pictures of petitioner.  The camera and a photograph of petitioner that had been on Smith's dining room

9  table were the only items missing from Smith's home.  Based on this evidence, the jury could have

10  inferred petitioner's guilt even without French's testimony regarding the confession.

11      Moreover, French was thoroughly discredited at trial in front of the jury.  He was described by

12  the defense as a heroin addict who frequently attempted to provide information about fellow prisoners

13  to law enforcement officials in exchange for a variety of rewards.  In one instance, the jury heard

14  testimony from Sergeant Gudelj that French had offered false evidence of a supposed conspiracy to

15  commit murder in order to attempt to escape from jail.  Additionally, the prosecutor told the jury during

16  closing that French had a history of attempting to provide information in exchange for deals or lenient

17  treatment.  The jury was also well aware that French had a history of providing questionable

18  information, and could calibrate the weight given to his testimony accordingly.  Under these

19  circumstances, to the extent it was erroneous to admit French's testimony, any such error was harmless.

20

21  **III.    *Brady* Violations**

22      Petitioner next challenges the trial court's refusal to provide him with a full transcript of an *in

23  camera* hearing at which four San Francisco police officers testified regarding prior cases in which

24  French claimed to have elicited jailhouse confessions.  Prior to his trial, petitioner initially sought

25  discovery of audiotapes of French's statements in three of the prior cases.  At a hearing on petitioner's

26  motion to compel discovery of the tapes, the state expressed concern over jeopardizing ongoing police

27

28  [20] Investigators had determined that the fire was set between 3:15 and 6:15 a.m., and that Smith was already dead at that time.

15

**United States District Court**
For the Northern District of California

1 investigations related to French's statements, and the trial court offered to question the four police

2 officers *in camera* regarding the information petitioner sought. Defense counsel agreed to this

3 procedure and submitted proposed questions. After the hearing, the trial court provided petitioner with

4 a summary of the evidence that it deemed relevant. Petitioner did not request a full transcript of the

5 hearing, and the trial court did not provide one.

6        The hearing transcript was later unsealed for petitioner's direct appeal in state court. During his

7 appeal, petitioner argued that the refusal to turn over the full transcript denied him his right to a fair trial

8 under *Brady v. Maryland*, 373 U.S. 83 (1963),[21] by depriving him of impeachment evidence showing

9 that a police officer had previously placed money in French's jail account, ostensibly in exchange for

10 information, and that another officer found inconsistencies in French's statements and had a colloquy

11 with the trial court about his sense that French was being untruthful. The California Court of Appeal

12 held that petitioner forfeited his right to bring a *Brady* challenge in relation to the trial court's *in camera*

13 hearing procedure when defense counsel agreed to the court's suggestion to hold a hearing outside

14 counsel's presence and did not object to receiving the court's summary of the information brought out

15 at the hearing, as opposed to a full transcript.

16        A federal habeas petitioner is procedurally barred from raising a claim of error which the state

17 court declined to address due to the petitioner's failure to comply with state procedural requirements.

18 "In these cases, the state judgment rests on independent and adequate state procedural grounds" that a

19 federal court lacks jurisdiction to review. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (U.S. 1991).

20 In this case, the California Court of Appeal determined that petitioner could not bring a *Brady* claim

21 with respect to the hearing transcript because he did not raise any objection either before or after the

22 hearing so as to preserve the matter for appeal. The court cited California case law setting forth the state

23 procedural bar rule in support of its conclusion. *See* Cal. Ct. App. op. at 30-31 (citing *People v. Jenkins*,

24

25      [21] Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective
26 of the good faith or bad faith of the prosecution." 373 U.S. at 87. Evidence is material for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).
27 The prosecution's duty to disclose potentially exculpatory evidence applies even when there has been no request by the accused, and encompasses impeachment evidence. *United States v. Agurs*, 427 U.S.
28 97, 107 (1976); *Bagley*, 473 U.S. at 676.

**United States District Court**
For the Northern District of California

1   997 P.2d 1044, 1113 (Cal. 2000) ("An appellate court will ordinarily not consider procedural defects

2   or erroneous rulings, where an objection could have been, but was not presented to the lower court by

3   some appropriate method.") (internal citation, quotation marks, and alterations omitted).

4          Because the state court's decision was clearly based on adequate and independent state

5   procedural grounds, this Court may not consider the *Brady* claim on federal habeas review.[22]

6

7   **IV.     Improper Testimony by Maffei**

8          Finally, petitioner contends that he was deprived of his right to due process by the trial court's

9   admission of testimony from Inspector Maffei regarding "inconsistencies" in petitioner's statements.

10  The factual background underlying this claim is as follows.  On cross-examination, defense counsel

11  questioned Maffei about why petitioner was not arrested until October 2004 despite the fact that he had

12  become a suspect in February 2004.  In making her point that Maffei had initially decided not to arrest

13  Ortiz, defense counsel asked Maffei: "[A]t the end of the interview you had inconsistencies, you had

14  a suspicious death, and you had an arson, but you let [Ortiz] go, is that correct?"  Maffei said yes.  On

15  redirect, the prosecutor asked Maffei to explain what he meant by "inconsistencies."  Maffei explained

16  that he meant "lies."  The prosecutor then asked Maffei what lies he was referring to.  Defense counsel

17  objected that Maffei should not be allowed to give his opinion on the truthfulness of petitioner's

18  statements.  The trial judge overruled this objection, and Maffei was permitted to answer that he thought

19  petitioner had lied when he initially said that he last called Smith at 1 a.m. and returned to his own home

20  by 2 a.m.  Maffei stated that once petitioner was informed that the police had his cell phone records, he

21  admitted he was outside Smith's house at 3 a.m.  Petitioner now contends that the trial court erred by

22  permitting Maffei to give his opinion on whether petitioner was lying during the interviews conducted

23  early in the investigation.

24         A state court's evidentiary ruling is not subject to federal habeas review unless the ruling

25

26         [22] The Court notes that petitioner's *Brady* claim would fail even if the Court could consider its
    merits because any error was clearly harmless.  As stated above, French's credibility was strenuously
27  impeached at trial by defense counsel.  Even the prosecutor urged the jury to view French's testimony
    with caution.  Under these circumstances, petitioner's inability to review the full transcript of the trial
28  court's *in camera* hearing did not affect the jury's verdict.

**United States District Court**
For the Northern District of California

1   infringes upon a specific federal constitutional or statutory provision or the error is of such magnitude

2   that it results in a denial of the fundamentally fair trial guaranteed by due process. *Pulley v. Harris*, 465

3   U.S. 37, 41 (1984); *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999).  "Under AEDPA, even

4   clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the

5   grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by

6   the Supreme Court." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (quoting 28 U.S.C.

7   § 2254(d)).  The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly

8   prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Id.*

9          Even assuming that the admission of Maffei's testimony regarding petitioner's veracity was

10  prejudicial, petitioner has not identified, and the Court was unable to find, any Supreme Court authority

11  stating that the admission of testimony from one witness regarding another witness's veracity amounts

12  to a due process violation.  Absent such authority, the Court cannot hold that the Court of Appeal's

13  rejection of petitioner's claim was contrary to or an unreasonable application of federal law.

14         Additionally, even if there were any error in the admission of Maffei's testimony, the error was

15  harmless given that the jury also watched the videotaped interview at which Smith made the inconsistent

16  statements.[23]  Maffei accused petitioner of lying several times during that taped interview, and the jury

17  would have been aware even without Maffei's testimony on the stand that he believed petitioner was

18  not telling the truth during the interview.  Petitioner is therefore not entitled to relief on his final claim.

19

20                                        **CONCLUSION**

21         For the foregoing reasons and for good cause shown, the Court hereby DENIES the petition for

22  writ of habeas corpus.  (Docket No. 1).

23

24  **IT IS SO ORDERED.**

25  Dated: June 24, 2010                                    _____

26                                                          SUSAN ILLSTON
                                                            United States District Judge
27

28         [23] Petitioner does not challenge the admission of the videotape.